1  AMY R. LEVINE, State Bar No. 160743
   alevine@mbdlaw.com
2  DAMARA MOORE, State Bar No. 215678
   dmoore@mbdlaw.com
3  SARAH L. DANIEL,State Bar No. 233814
   sdaniel@mbdlaw.com
4  MILLER BROWN & DANNIS
   71 Stevenson Street, 19th Floor
5  San Francisco, CA 94105
   Telephone: (415) 543-4111
6  Facsimile: (415) 543-4384

7  Attorneys for Defendants
   SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11
   G.B., a minor by and through T.B., his          Case No. C-08-02805 EDL
12 Guardian Ad Litem,
                                                   **DEFENDANT SAN RAMON VALLEY**
13              Plaintiff,                          **UNIFIED SCHOOL DISTRICT'S**
                                                   **APPENDIX OF FOREIGN AUTHORITIES**
14         v.                                       **IN SUPPORT OF ITS MOTION FOR**
                                                   **SUMMARY JUDGMENT**
15
   SAN RAMON VALLEY UNIFIED
16 SCHOOL DISTRICT,                                Hearing Date:    August 26, 2008
                                                   Time:            9:00 a.m.
17              Defendants.                         Courtroom:       E, 15th Floor
                                                   Magistrate Judge: Hon. Elizabeth Laporte
18

19                                                 Complaint Filed: June 5, 2008

20         Defendant SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT hereby submits

21 this Appendix of Foreign Authorities in Support of its Motion for Summary Judgment.

22 Attached are copies of the following authorities:

23         1.    *Ripon Unified Sch. Dist.,*
                  107 LRP 57047 (2007)
24

25         2.    *Manteca Unified Sch. Dist.,*
                  47 IDELR 85, 106 LRP 63898 (2006)
26

27         3.    *Temecula Valley Unified Sch. Dist.,*
                  46 IDELR 268, 106 LRP 64094 (2006)
28

                                            1

SF 322235v1

1    4.    *Berkeley Unified Sch. Dist.*
         106 LRP 49486 (2006)

2

3

4    DATED: July 18, 2008                    MILLER BROWN & DANNIS

5

6

7                                            By:  /s/ Amy R. Levine
                                             AMY R. LEVINE
8                                            Attorneys for Defendant
                                             SAN RAMON VALLEY UNIFIED
9                                            SCHOOL DISTRICT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT'S MOTION FOR SUMMARY
JUDGMENT; CASE NO. C-08-02805 EDL

SF 322235v1

107 LRP 57047

**Ripon Unified School District**
**California State Educational Agency**
N2007060591
**September 12, 2007**
**Judge / Administrative Officer**
Richard M. Clark, Administrative Law Judge

**Full Text**
**Appearances:**

## DECISION

Richard M. Clark, Administrative Law Judge, Office of Administrative Hearings, Special Education Division, State of California, heard this matter on August 7 and 8, 2007, in Stockton, California.

Patrick Balucan, attorney at law, represented Ripon Unified School District (District). Camille Taylor, Director of Special Education for the District, was present during the hearing.

Tamara Loughrey, attorney at law, represented Student. Christopher Ide-Don and Robert Woelfe, both attorneys at law, were also present and examined witnesses on behalf of Student. Student's parents (Parents) were present during the hearing.

The District filed its request for due process hearing on June 19, 2007. The matter was continued on July 6, 2007. Oral and documentary evidence were received during the hearing. The record remained open for the submission of written closing arguments by August 17, 2007, when the record was closed and the matter was submitted for decision.

### ISSUE

May the District conduct a triennial assessment of Student pursuant to the March 30, 2007 assessment plan, without parental consent and without the conditions and restrictions requested by Parents?

### CONTENTION OF THE PARTIES

The District contends that as part of Student's triennial evaluation, it has the right to assess Student without any conditions or restrictions imposed by

Parents. The District seeks a finding that it can assess Student, without parental consent, pursuant to the proposed assessment plan dated March 30, 2007.

Student contends that his Parents signed consent to the March 30, 2007 assessment plan and that the hearing was unnecessary. Student also contends that he did not set any conditions on the testing, but instead sought "reasonable accommodations" as required by his IEP. Further, Student contends that the District is retaliating against him because of a tort claim action filed in federal court by his Parents against the District.

### FACTUAL FINDINGS

1. Student is eight years old and resides in the District with his family, where he attends Parkview Elementary School. Student is eligible for special education under the category of autistic-like behaviors. Student first became eligible for special education pursuant to an Individualized Education Program (IEP) meeting on June 1, 2004. His triennial assessment was due on June 1, 2007.

2. On March 30, 2007, the District proposed a written assessment plan for Student's triennial assessment. The assessment plan sought to test in the following areas using qualified professionals: academic/pre-academic areas by a special education teacher, psycho-motor development by an adaptive physical education specialist, intellectual development and social/emotional/behavior status by a school psychologist, health development by a school nurse and school psychologist, and other information, including previous assessments, inter-agency information, a cumulative file review, and/or independent evaluations. The assessment plan was presented on a pre-printed form which contained the notation, "Detailed descriptions of specific tests are available upon request." The assessment plan had three boxes for parental consent. The first box stated that, "I understand the assessment plan, my enclosed parental rights, and that no special education placement will result from this assessment plan without my consent." The next two boxes were, "Yes, I give my permission to conduct this assessment as

Copyright # 2007 LRP Publications

Exhibit 1
Page 1 of 6

described," or, "No, I do not give my permission for this assessment."

2

3. On April 2, 2007, Sean Henry, school psychologist, sent home a notice of reevaluation that contained the March 30, 2007 assessment plan. Initially, Mr. Henry incorrectly checked a box stating that the District did not need to conduct an assessment of Student, but included the statement that the District sought to conduct an assessment of Student because "updated levels of functioning will be beneficial for better understanding [Student's] skills and learning needs." Mr. Henry sent a corrected copy of the notice of assessment the next day with the correct box checked and included the same statement that indicated the District would like to conduct a complete assessment.

4. On April 3, 2007, Student's mother sent an e-mail to Camille Taylor, Director of Special Education for the District, acknowledging receipt of the assessment plan and stating she understood the error in the two introductory letters. In her email to the District, Mother requested an explanation regarding what comprised a "full assessment," including the names of the test instruments, the reasons the particular assessments were requested, the name of the evaluator, the education, training, experience of the assessor in the area of autism, and the subject area of assessment or test, to ensure the evaluator met the requirements of 20 U.S.C. 1414(b)(3)(A)(i-v).1 She indicated she needed "this information prior to signing the assessment plan with fully informed consent."

5. On April 18, 2007, the District provided Mother with prior written notice that the school psychologist, Mr. Henry, would be conducting the assessment and it was up to him to use his judgment and expertise to determine which standardized testing instruments would be administered to Student as part of the assessment.2

6. On April 27, 2007, District staff met with Parents to discuss the impasse related to the

assessment plan in an effort to reach a compromise. The parties discussed the standardized tests that would be used and listed the agreed upon tests on the assessment plan. The parties agreed to use the Wechsler Intelligence Scale for Children Fourth Edition (WISC-IV), the Woodcock Johnson-III, the Kaufman Assessment Battery for Children Second Edition (KABC-II), the Kaufman Test of Educational Achievement, Second Edition (KTEA-II), and the Behavior Assessment System for Children, Second Edition (BASC-II), which would include an interview of Student. The interview of Student would supplement

1 Title 20 United States Code section 1414(b)(3) discusses the additional requirements for evaluations and requires that: "Each local educational agency shall ensure that: (A) assessments and other evaluation materials used to assess a child under this section: (i) are selected and administered so as not to be discriminatory on a racial or cultural basis; (ii) are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer; (iii) are used for purposes for which the assessments or measures are valid and reliable; (iv) are administered by trained and knowledgeable personnel; and (v) are administered in accordance with any instructions provided by the producer of such assessments."

2 The prior written notice also stated that the District would not conduct further occupational therapy (OT) assessments because an OT assessment had recently been completed. Further, the prior written notice stated that the Parent request for a reading assessment at Lindamood Bell made in a dissent to the January 19, 2007 IEP was premature in light of the request to conduct academic testing as part of the proposed assessment plan.

3

the BASC-II, and inquire about Student's own perceptions and views about school, whether Student thought he was being successful, how he sees himself

Exhibit 1
Page 2 of 6

in relation to other students, whether Student was excluded from activities and other information directly from Student about his program. The parties also agreed that a behavioral therapist from Genesis could be present during the assessments.3 The parties did not discuss tape recording of the assessments, and they did not discuss the District providing the test instruments, protocols, raw data, test questions or copies of the assessment reports, prior to the IEP meeting.

7. On April 30, 2007, Student's mother signed the assessment plan and checked the box, "Yes, I give my permission to conduct this assessment," but lined through the words "as described" and inserted the words "per above notes." Student's mother included a lengthy note in the box of the assessment plan entitled, "Additional Student Information Parent Would Like Considered." The explanation was as follows:

Consent is being given to perform ONLY the following assessments: WISC-IV, K-ABC II, K-TEA II, WJ-III, the BASC-II, hearing and vision screening and observations of [Student] in his natural environment in the classroom and on the playground. However consent is not being given for informal assessments of any kind, including, but not limited to, informal talks, discussions, interviews, etc., about [Student's] perceptions about himself, how he feels about school, if he feels he is being excluded from activities or any other type of assessment not specifically described above. All assessments described above shall not deviate from each test's protocol in any manner. All assessments will be given in the presence of a behavior therapist or higher individual from Genesis Behavior Center. Romina has assured us she will be able to provide a BT or higher to be present for all assessment periods. Copies of all assessment reports, raw data, test protocols and test questions shall be provided to us at least five days prior to the IEP meeting. All assessment sessions with [Student] shall be audio recorded. We will show Genesis how to operate our tape recorder.

The statement provided by Parents was not consent to the proposed assessment plan, but instead imposed additional conditions upon the evaluation process which had not been discussed or agreed upon at the meeting on April 27, 2007. In essence, Parents made a counter-offer to the District's proposed assessment plan.

8. Ms. Taylor established that the meeting and the conditions requested were unusual, but the District agreed as a compromise to move forward with the assessment process. In most cases, the District provides enough information to the parents so they are aware of what is going on in the process, but it is up to the independent evaluator, using

3 The WISC-IV manual permits, on rare occasion and at the test administrator's discretion, an accompanying adult to be in the room to facilitate testing, with appropriate instruction to remain silent and not prompt the student taking the test.

4

professional experience and judgment, to determine which tests to utilize to most effectively evaluate Student. When Mother returned a copy of the signed assessment plan, Ms. Taylor had concerns about tape recording the assessments, as did other District personnel, and contacted Harcourt Brace to ask about copyrights.4

9. On May 9, 2007, the District sent Parents prior written notice denying the Parent's request to have a one-to-one behavioral therapist observe and tape record all assessments in the proposed triennial evaluation. The District explained that the denial was based upon the legal policies of the test developers, copyrighted test protocols, and confidential nature of the test questions and instruments. Further, the District objected to not allowing informal conversation with Student while the testing was occurring. The District staff believed that informal evaluations were an integral part of the evaluation process, including rapport building and responding to questions from Student, which would provide a more thorough triennial evaluation. It was the position of the District that the limitations placed upon the

Exhibit 1
Page 3 of 6

evaluation process by Student was not consent to the evaluation and would limit the ability of the District to get an accurate assessment of Student.5

10. Student offered testimony and evidence that the District allowed the parents of other students to observe portions of assessments that did not include standardized testing and that the District provided test protocols to the parents of the other students. The evidence and testimony was unpersuasive and generally irrelevant. What the District may or may not have done in other cases is not relevant to what should occur in this case, and is not relevant to the District's legal requirements for conducting assessments. The ALJ is not persuaded by the testimony of other parents who testified in this case. Furthermore, the District did not dispute that the test answer sheets were available to Parents since the test protocols become part of Student's school record. (Ed. Code, ## 49060-49085.) The persuasive weight of the evidence and testimony, including testimony of Student's expert Dr. Wright, established that the actual test itself is not produced and given to the Parents for a variety of reasons including copyright infringement, test confidentiality and security to prevent the questions from being widely disseminated, and other ethical concerns. Whether the tests are widely available on the Internet is again irrelevant to the District's legal obligations in this matter.

4 On or about January 25, 2007, Student filed a lawsuit in the United States District Court for the Eastern District of California alleging civil rights violations by the District. Ms. Taylor was credible and established that she was not aware that a federal court action had been filed prior to filing for due process in this matter and that the District did not file for due process in retaliation for the federal lawsuit.

5 On July 27, 2007, Tamara Loughrey, attorney for Student, sent a letter to Ms. Taylor making a formal request for accommodations under Title II of the Americans with Disabilities Act. She requested that one of Student's behavioral therapists be present during testing and that the testing be tape recorded.

Ms. Loughrey claimed that the requests were reasonable and that Student's IEP provides for similar accommodations during testing, including STAR testing. The letter was sent a month and a half after the due process case had been filed. The District did not respond to the letter.

5

11. Dr. Roslyn Wright is a licensed psychologist in private practice who had recently conducted an independent assessment of Student. She has a doctorate in clinical psychology, a master's degree in counseling and education, and a bachelor's degree in psychology, and has been a licensed psychologist since 2001. She observed that Student had a difficult time sitting still, was impulsive and fidgeted. At one point, Dr. Wright allowed Mother to stand in the back of the testing room to focus Student so he could complete the testing. Dr. Wright allows a person in the testing room if it is necessary and believes an evaluator should use his or her professional judgment to determine if the presence of someone in the room would be required. Allowing an individual in the testing room would be a non-standard condition and should be noted in the formal report. Dr. Wright does not consider rapport building to be an informal assessment, which is an evaluation of the student that does not use standardized measures. Dr. Wright used several informal assessments in the area of social-emotional and clinical interviews, including a behavioral checklist. Dr. Wright stated that she would not allow an assessment to be tape recorded, and had the same concerns regarding professional ethics as the District employees. She did not give Mother a specific list of tests, but discussed generally what the tests would be. She stated that a certain amount of trust is required in the assessment process. Mother also did not ask to tape record sessions with Student. Dr. Wright was a credible witness and corroborated the professional opinions of the District staff regarding the assessment process, testing, and professional concerns and ethics.

APPLICABLE LAW

1. The District bears the burden of persuasion in

Exhibit 1
Page 4 of 6

this matter. (Schaffer vs. Weast (2005) 546 U.S. 49 [126 S.Ct. 528].)

2. Reassessment of a student eligible for special education must be conducted at least every three years, or more frequently if the local educational agency determines conditions warrant reassessment, or if a reassessment is requested by the student's teacher or parent. (20 U.S.C. # 1414(a)(2)(A); Ed. Code, # 56381, subds. (a)(1), (2).) No single procedure may be used as the sole criterion for determining whether the child has a disability or for determining an appropriate educational program for the child. (20 U.S.C. # 1414(b)(2), (3); Ed Code, #56320.)

3. A reassessment requires parental consent. (20 U.S.C. # 1414(c)(3); Ed. Code,

## 56321, subd. (c), 56381, subd. (f).) To obtain consent, a school district must develop and propose a reassessment plan. (20 U.S.C. # 1414(b)(1); Ed. Code, ## 56321, subd. (a), 56381, subd. (f).) If the parents do not consent to the plan, the district can conduct the reassessment only by showing at a due process hearing that it needs to reassess the student and is lawfully entitled to do so. (20 U.S.C. # 1414(a)(1)(D); 34 C.F.R. # 300.300(c) (2006); Ed. Code, ## 56321, subd. (c), 56381, subd. (f), 56501, subd, (a)(3), 56506, subd. (e).) The District must propose a written assessment plan and include notice of the procedural safeguards under the Individuals with Disabilities Education Improvement Act (IDEA) and state law. (20 U.S.C # 1414(a)(1)(D)(ii); Ed. Code, ## 56321, 56329, 56381..)

6

4. A parent who wishes that a child receive special education services must allow reassessment if conditions warrant; "if the parents want [their child] to receive special education under the Act, they are obliged to permit such testing." (Gregory K. v Longview School Dist. (9th Cir. 1987) 811 F.2d 130, 1315.) "A parent who desires for her child to received special education must allow the school district to reevaluate the child using its own personnel; there is

no exception to this rule." (Andress v. Cleveland Independent School Dist. (5th Cir. 1995) 64 F.3d 176, 179.) [T]here is no exception to the rule that a school district has a right to test a student itself in order to evaluate or reevaluate the student's eligibility under the IDEA." (Id. at 178.)

DETERMINATION OF ISSUE

1. As determined in Factual Findings 1 and Legal Conclusion 2, Student's triennial evaluation was due on June 1, 2007. Accordingly, the District had to a request a reassessment of Student for the triennial evaluation.

2. As determined in Factual Findings 2 to 4 and Legal Conclusion 3, the District properly noticed the triennial assessment to Parents and provided a proper written assessment plan to Student.

3. As determined in Factual Findings 5 to 11 and Legal Conclusions 2 to 4,

Student's parents did not consent to the March 30, 2007 assessment plan. The conditions imposed by the written response from Parents impeded the District's ability to evaluate and assess the special education needs of Student. The District has the right to evaluate Student for special education services using its own personnel. In so doing, District staff needed to use their professional judgment and training to determine the proper tests to be given, the nature of observations during the assessment process, and information they would need to gather to produce valid test results. The conditions and restrictions proposed by Parents would unfairly constrain the assessment process such that the District might not have received the proper picture of Student, the nature of his disability, and how best to meet his needs in the educational environment. Further, the nature of the conditions imposed by the Parents would have required that the District use only a single criterion to determine the appropriate educational program for Student. The District made reasonable efforts to obtain parental consent to the assessment plan and made reasonable efforts to inform the Parents about the process. Further, the District made reasonable

Exhibit 1
Page 5 of 6

attempts to accommodate the parental requests, but was under no legal obligation to do so. The District is legally mandated to reassess Student for his triennial evaluation without restriction or condition from the parents.

4. Accordingly, the District is entitled to assess Student pursuant to the March

30, 2007 assessment plan without condition or restriction and without parental consent. The District is not obligated to provide any accommodations, including recording of the testing

7

sessions or the presence of a behavioral therapist, unless in the professional judgment of the individual evaluator, it would be necessary to assist the testing process.

ORDER

1. The District is entitled to assess Student pursuant to the March 30, 2007 assessment plan, without conditions or restrictions imposed by Parents, and without parental consent.

Parents shall make Student reasonably available for assessment by the District. > PREVAILING PARTY

The hearing decision shall indicate the extent to which each party has prevailed on each issue heard and decided. (Ed. Code, # 56507, subd. (d).) The District prevailed on all issues heard and decided.

Copyright # 2007 LRP Publications

Exhibit 1
Page 6 of 6

**47 IDELR 85**

**106 LRP 63898**

**Manteca Unified School District**

**California State Educational Agency**

N2005110521

**June 9, 2006**

**Related Index Numbers**

**175.007 Identification Procedures**

**400.015 Notice of/Consent to Reevaluations**

**400.020 When Reevaluations Required**

**Judge / Administrative Officer**

Deidre L. Johnson, Administrative Law Judge

**Case Summary**

A California district will be able to assess a 9-year-old student's continued need for speech-language therapy, despite her parents' refusal to consent to a reevaluation. An ALJ concluded that the district's reasonable efforts to obtain the parent's consent allowed it to proceed with its proposed assessment. In reaching her decision, the ALJ noted that LEAs cannot terminate a student's special education services without reevaluating the student's eligibility. Although it was the parents, and not the district, who sought to terminate the third-grader's speech-language therapy, the ALJ observed that the reevaluation requirement still applied. "[The district] has no objective information that [the student] no longer qualifies for special education services, but even if it did have such information, [the district] is required to reassess [the student] to make that determination," the ALJ wrote. Noting that the district twice requested the parents' consent for a reevaluation and provided copies of the proposed assessment plan, the ALJ concluded that the district undertook reasonable efforts to obtain the parents' consent.

**Full Text**

**Appearances:**

**Decision**

Administrative Law Judge (ALJ) Deidre L. Johnson, State of California Office of Administrative

Hearings, Special Education Division (OAHSED), heard this matter on June 1, 2006, in Manteca, California.

Effective May 3, 2006, Petitioner Manteca Unified School District (Manteca USD, or District) filed an amended request for a due process hearing (complaint)[1] regarding Respondent (Student), pursuant to the Order on Motion to Amend Due Process Complaint of the same date issued by ALJ Keith J. Kirchubel.

District was represented at hearing by Janice Callanan, Manteca USD Director of Special Education. No appearance was made by or on behalf of Student or her Parents (Parents, Mother, or Father), and neither Student nor her Parents were present or testified.

Witness testimony and documentary evidence were received. District made oral closing argument, the record was closed, and the matter was submitted on June 1, 2006.

**Issue**

Does District have the right to assess Student pursuant to a triennial assessment plan, despite her Parents' lack of consent?

**Factual Findings**

**Service**

1. On April 20, 2006, District served a copy of the amended complaint on Parents at their address of record with the District. The amended complaint was deemed filed on May 3, 2006.

2. On May 4, 2006, OAHSED served a Notice of Due Process Hearing and Mediation on both the District and Parents at their respective addresses of record, setting the due process hearing herein for June 1, 2006, at 9:30 a.m., to be held in the offices of Manteca USD, located at 2901 E. Louise Avenue, Manteca, CA 95336.

3. Shortly after 9:00 a.m. on June 1, 2006, and just prior to the start of the hearing herein, Tracey Jakubowski, a Program Specialist with District's Special Education division, called Parents. She called

Exhibit 2
Page 1 of 6

Mother at Mother's cell phone number, known to the District as an emergency contact number, and left a message. She then called Father at Father's known cell phone number. Father answered the telephone. Ms. Jakubowski asked him if Student and/or Parents intended to appear at the hearing scheduled to begin at 9:30 a.m. Father informed her that Student and Parents did not intend to appear.

4. At 9:35 a.m. on June 1, 2006, the hearing in this matter commenced and continued until 11:00 a.m., when the record was closed.

### Eligibility and Disability

5. Student recently turned nine years old, and lives with her family within the boundaries of the District. She attends third grade at New Haven Elementary School (New Haven) in the District. Student first became eligible for special education and related services in May of 2003, qualifying as Speech or Language Impaired. At that time, District conducted a speech and language assessment in English, Student's language.

6. Student's initial May 2003 individualized education program (IEP) determined that Student had deficiencies in the area of language, that impeded her education. Parents attended the IEP meeting and consented to the IEP. Student primarily had problems answering "Wh" questions (Who, What, When, Where, or Why), and had trouble with verbal problem solving skills. While her fluency was within the average range, she had difficulty labeling objects or completing sentences, had poor eye contact, and did not appear to interact with other pupils, her peers, on a consistent basis. The IEP team agreed to place Student in a general education classroom daily for academics, and to provide her with a small group pull-out setting for language therapy sessions, for twenty-five minutes once a week.

7. Student's last agreed-upon IEP was on May 5, 2005. Student and her Parents attended the May 2005 annual review meeting at New Haven. Cynthia Vasconcellos Knauss (Ms. Knauss), District's Language, Speech, and Hearing Specialist who has

worked with Student since 2003, reviewed the annual speech and language assessment summary with the IEP team. Student's teacher assessed her then-present levels of functioning for accessing core curriculum. Student's progress toward her annual goals was evaluated. Student had achieved her goal of improving the use of appropriate eye contact when answering a question, and was able to answer "Why" and "Who" questions six out of ten times over two consecutive sessions. Student continued to have difficulty with problem solving skills (pragmatics), and still did not appear to have much peer interaction. New goals were written for expressive language and pragmatics, and the May 2005 IEP again offered Student weekly twenty-five minute language and speech services in a small group pull-out session. Parents consented to the May 2005 IEP.

### Parents' Request to Terminate Special Education Services

8. On September 20, 2005, Mother went to New Haven, spoke with Student's speech therapist, Ms. Knauss, and requested Student's immediate "dismissal" from special education services. Ms. Knauss explained to Mother that the law does not permit the District to drop or "exit" a pupil from special education services without a new assessment to determine whether the pupil is still eligible, or no longer qualifies. Father spoke to Ms. Knauss by telephone, as well, and was "adamant" that services cease. Parents believed Student no longer needed any speech or language services. Parents also spoke to Student's classroom teacher and the Director of Special Education. District offered to "move up" Student's triennial assessment date of May 2006, and to do that assessment in the fall of 2005, to investigate Parents' contention.

### District's Proposed Triennial Assessment Plan

9. On September 20, 2005, District mailed to Parents at their address of record a cover letter and a proposed assessment plan of the same date. A notice of parental rights and procedural safeguards was also

---

Copyright # 2007 LRP Publications

Exhibit 2
Page 2 of 6

sent. The proposed individual assessment plan proposed to assess Student in the areas of: (1) Language, Speech, and Communication Development by a Language, Speech and Hearing Specialist; and (2) Health Development.[2]

10. District's September 2005 request to assess Student was based on District's desire to cooperate with Parents to assess whether Student remained eligible for special education services or not. It was a triennial assessment plan in advance of Student's triennial assessment due in the Spring of 2006. Parents returned the assessment plan form to District, executed by Father on September 21, 2005. Father indicated that he understood the plan and his parental rights, and checked the box stating: "No, I do not give my permission for this assessment." Someone printed "Why?" in a comment box.

11. On April 7, 2006, District again notified Parents in writing of their proposal to conduct Student's triennial assessment, an assessment required by law to be completed every three years for all children with disabilities receiving special education and related services. Accordingly, District mailed to Parents, at their address of record, a cover letter and a proposed assessment plan of the same date. A second notice of parental rights and procedural safeguards was also included. Identical to the September 2005 proposal, the individual assessment plan proposes to assess Student in the area of Language, Speech, and Communication Development by a Language, Speech and Hearing Specialist. The plan indicates that tests and observations would measure Student's ability to "understand, relate to and use language and speech clearly and appropriately." It indicates that the tests "may also measure auditory perceptual skills." The plan also proposes to assess Student in the area of Health Development. It indicates that tests and observations would measure vision, low vision, hearing, health, developmental history and medical history, as well as a review of medical records.

12. For the triennial assessment, District's speech therapist would review Student's prior tests and goals, use standardized tests, and select tests in English that are appropriate for Student's chronological and developmental age. The tests would include the Test of Language Development, Primary (TOLD-P:3, up to age eight), or the Test of Language Development, Intermediate (TOLD-I:3, from age eight to thirteen); the Test of Problem Solving, which looks at answering "Wh" questions, and the Test of General Pragmatic Skills, which is observational. Depending on how Student does on the generalized language tests, Ms. Knauss would also seek to evaluate Student's vocabulary, and use The Test of Semantic Skills, and/or a sentence structure test. She would also do an articulation screening if appropriate. Ms. Knauss has a Master of Arts degree in speech pathology, is certified by the American Speech, Language and Hearing Association,[3] and is licensed by the State of California as a speech and language therapist. District is not aware of any other suspected areas of disability, and the health review is precautionary.

13. At no time since on or about September 20, 2005, has Student received special education related services in speech and language from District, even though District has continued to offer such services under the May 2005 IEP. Student has declined to accept such services, and has attended her general education classroom only.

14. Student's general education teacher, Peggy Dianne Danel, described Student's language problems in her classroom, from August of 2005 to the week before the hearing. Those problems remain consistent with the May 2005 IEP's description of her problems. While Student loves math and is quick to recite answers to math problems, she still struggles with verbal problem solving, such as the "Wh" questions, and will generally give up, put her head down, or say "I don't know," even when the teacher believes Student does know the answer. In contrast, Student does not display this level of verbal frustration when engaged in playing or sharing information about a preferred topic, such as cats. The teacher has not seen any change in Student's struggles since August of 2005.

---

Copyright # 2007 LRP Publications

Exhibit 2
Page 3 of 6

15. District is not sure Parents understand the nature of Student's disability because neither Mother nor Father has observed Student's academic performance and related problems in the classroom. Parents have not made Student available to the District for any evaluation or assessment since the May 2005 IEP.

## Legal Conclusions

## Applicable Law

1. District, as the Petitioner, has the burden of proof in this proceeding. *(Schaffer v. Weast* (2005) _____ U.S. _____ [126 S. Ct. 528, 163 L. Ed.2d 387].)

2. A child with a disability has the right to a free appropriate public education (FAPE) under the reauthorized Individuals with Disabilities Education Act (IDEA 2004). (20 U.S.C. 1412(a)(1)(A).) Special education is defined in pertinent part as specially designated instruction, at no cost to parents, to meet the unique needs of the child. (20 U.S.C. # 1401(29); Ed. Code # 56031.) Before any action is taken with respect to the initial placement of an child with special needs, an assessment of the pupil's educational needs shall be conducted. (California Education Code [Ed. Code] # 56320.) Thereafter, special education students must be reassessed not more frequently than once a year, and shall be reassessed at least once every three years, unless the parent and the local educational agency (LEA) agree otherwise. A reassessment shall be conducted if the LEA determines "that the educational or related services needs, including improved academic achievement and functional performance, of the pupil warrant a reassessment." (20 U.S.C. # 1414(a)(2)(A); Ed. Code # 56381, subd. (a).) Education Code section 56381, subdivision (a) also provides that the LEA shall conduct a reassessment if the pupil's parent or teacher requests a new assessment. The student must be assessed in all areas related to his or her suspected disability, and no single procedure may be used as the sole criterion for determining whether the student has a disability or an appropriate educational program.

(20 U.S.C. # 1414(a)(2), (3); Ed. Code # 56320, subd. (e), (f).)

3. The reassessment plan must be accompanied by a notice of the parent's rights and a written explanation of the procedural safeguards under IDEA and California law. (Ed. Code # 56321, subd. (a).) The parent has at least fifteen days from the receipt of the proposed assessment plan to arrive at a decision. (Ed Code # 56321, subd. (c).)

4. Tests and assessment materials must be administered by trained personnel in conformance with the instructions provided by the producers of the tests. (20 U.S.C. # 1414(a)(2), (3); Ed. Code # 56320, subd. (a), (b).) Assessments must be conducted by individuals who are both "knowledgeable of the student's disability" and "competent to perform the assessment, as determined by the school district, county office, or special education local plan area." (20 U.S.C. # 1414(b)(3)(B)(ii); Ed. Code ## 56320, subd. (g), 56322.)

5. An LEA is required to reassess a student to evaluate his or her eligibility for special education and related services before determining that the child is no longer a child with a disability, and terminating special education services. (20 U.S.C. # 1414(c)(5); Ed. Code # 56381, subd. (h).)

6. While the law provides that an LEA has the right and obligation to conduct assessments, parental consent is required before a school district may conduct assessments. (20 U.S.C. # 1414(a)(1)(C)(i); Ed. Code # 56321, subd. (c).) An LEA can override a lack of parental consent if the LEA establishes at a due process hearing that assessment is needed. (20 U.S.C. # 1414(a)(1)(C)(ii); Ed. Code ## 56321, 56329, subd. (c), 56506, subd. (e).) The LEA must demonstrate at hearing that it has taken reasonable measures to obtain the consent of the parent, and that the child's parent has failed to respond. (Ed. Code ## 56381, subd. (f), 56506, subd. (e).)

## Determination of Issues

7. Pursuant to Factual Findings 8, 9, and 10, District provided adequate legal notice to Parents of

Exhibit 2
Page 4 of 6

the September 2005 assessment plan. Parents requested Student's immediate exit from special education on September 20, 2005. Thereafter, Parents received District's notice and September 2005 assessment plan, returned the plan to the District, and expressly refused in writing to consent to it. Competent evidence was presented that three District personnel spoke with Parents by telephone in September, and explained that District could not exit Student from special education services without complying with the law to reassess Student.

8. As found in Factual Findings 7, 9, and 10, District's proposed assessment plan of September 20, 2005, would have occurred within one year of Student's annual, observational assessment of May 2005, in connection with the May 2005 IEP. District could have reassessed Student in the fall of 2005, with the consent of Parents. The assessment law provides that the parties could have agreed to more than one assessment within a year, but Parents did not agree. Parents did not request an assessment, but an exit from services. Pursuant to Factual Findings 7, 8, 10, and 14, District did not establish that it had any independent basis to determine that reassessment in the fall of 2005 was warranted, because it knew of no change in Student's needs, other than Parents' request to cease services.

9. Pursuant to Factual Findings 6, 10, 11, 12, and 14, District's proposed assessment plan dated April 7, 2006, occurred in the context of Student's mandatory triennial assessment, which was due by May 13, 2006. District determined that Student needs reassessment because the law requires it, and this would be her first triennial assessment since becoming eligible in 2003. District has no objective information that Student no longer qualifies for special education services, but even if it did have such information, District is required to reassess Student to make that determination.

10. As found in Factual Findings 7, 11, 12, and 14, District provided adequate legal notice to Parents of the April 2006 triennial assessment plan. District sent the notice letter and the proposed assessment plan on April 7, 2006, to Parents at their same address of record with the District, along with notice of parental rights and procedural safeguards. District's planned assessments would be conducted by a trained and qualified speech and language therapist, Ms. Knauss. Under Education Code section 56321, Parents had fifteen days within which to respond to the plan, or until April 22, 2006. Since that was a Saturday, Parents could have timely responded by Monday, April 24, 2006.[4] On April 20, 2006, District's proposed amended complaint, which added the issue of the 2006 triennial assessment plan to its earlier complaint, was served on Parents and OAHSED. OAHSED did not grant the motion to amend until May 3, 2006. During the interval, Parents could still have responded to the proposed plan (or filed an objection to the proposed due process amendment), and did not do so. There is no evidence that Parents were prejudiced by the four-day overlap between the assessment timeline and the serving of the due process notice. District has taken reasonable measures to obtain Parents' consent to the plan. Since the April 2006 proposed assessment plan otherwise meets the legal requirements, it is upheld. District has the right to assess Student based on the triennial assessment plan in the absence of parental consent.

## Order

1. District may conduct reassessments of Student pursuant to the proposed triennial assessment plan of April 7, 2006.

2. The Parents of Student shall make her reasonably available for the reassessments.

## Prevailing Party

District prevailed on the only issue for hearing in this case. (Ed. Code # 56507, subd. (d).)

## Notice of Appeal Rights

The parties are advised that they have the right to appeal this decision to a state court of competent jurisdiction. Appeals must be made within 90 days of receipt of this decision. Or, a party may bring a civil action in United States District Court. (Ed. Code #

Exhibit 2
Page 5 of 6

56505, subd. (k).).

[1]A request for a due process hearing under California Education Code section 56502 is the due process complaint notice required under 20 United States Code (U.S.C.) section 1415(b)(7)(A).

[2]Ms. Knauss testified that she would have been the assessor for both areas of development.

[3]ASHA is a national professional, scientific, and credentialing association for over one hundred thousand professionals who are speech-language pathologists, audiologists, and speech, language, and hearing scientists.

[4]See Code of Civil Procedure section 12a.

**Statutes Cited**

20 USC 1412(a)(1)(A)
20 USC 1401(29)
20 USC 1414(a)(2)(A)
20 USC 1414(a)(2)
20 USC 1414(a)(3)
20 USC 1414(b)(3)(B)(ii)
20 USC 1414(c)(5)
20 USC 1414(a)(1)(C)(i)
20 USC 1414(a)(1)(C)(ii)

**Cases Cited**

44 IDELR 150

Exhibit 2
Page 6 of 6

**46 IDELR 268**

106 LRP 64094

### Temecula Valley Unified School District
### California State Educational Agency
### N2006050294
### June 21, 2006

**Related Index Numbers**

**113.20 Evaluation**

**185.035 Need for Evaluation**

**400.015 Notice of/Consent to Reevaluations**

**Judge / Administrative Officer**

Elizabeth R. Feyzbakhsh, Administrative Law Judge

**Case Summary**

An ALJ authorized a California district to conduct psychological, speech-language and health-related assessments of a 12-year-old student with autism, despite the parents' refusal to consent to the assessment plan. Observing that reassessment was necessary to determine the student's present levels of performance and to allow his IEP team to develop appropriate goals and objectives, the ALJ ordered the parents to make the student available for reevaluation if they wanted him to continue receiving special education and related services. The ALJ pointed out that the IDEA requires districts to assess a student in all areas related to a suspected disability. While both the IDEA and California law require districts to obtain parental consent before evaluating a student, the ALJ noted that districts can proceed without consent if they can demonstrate that such an assessment is necessary. The ALJ observed that the student's triennial review was due in 2006. "Not only is the district entitled to conduct an assessment, it is required to conduct an assessment and that fact that the parents refuse to sign the assessment plan does not relieve the district of that obligation," the ALJ wrote. Furthermore, because California law mandates that a psychological assessment be performed by a credentialed school psychologist, the ALJ concluded that the parents were not entitled to choose their own

evaluator.

**Full Text**

**Appearances:**

### Decision

Elizabeth Feyzbakhsh, Administrative Law Judge, Office of Administrative Hearings, Special Education Division, heard this matter on June 8, 2006, in Temecula, California.

Petitioner Temecula Valley Unified School District (District) was represented by attorney Kelli Lydon of the law firm Lozano Smith. Ann Huntington, Director, Special Education Division was present throughout the hearing.

Respondent Student was represented by his parents, who were present throughout the hearing.

The record of this due process hearing was opened on June 8, 2006. At the request of the parents the hearing was opened to the public. Testimony was taken and evidence was offered and received. The record was closed and the matter was submitted on June 8, 2006.

### Issue

Is the District entitled to assess Student based on the proposed assessment plan dated February 22, 2006?

### Factual Findings

1. Student is a twelve year old boy who is eligible for special education and related services due to a diagnosis of Autism. He currently resides with his parents within the geographical boundaries of the Temecula Valley Unified School District.

2. Student is currently in the sixth grade. He has received special education services since the age of three. Starting in the fall of 2005, Student's parents unilaterally decided to provide his education at home. This was not part of an agreed upon Individual Education Plan (IEP). In October 2005, an IEP team meeting was held and parents requested that Student be home schooled. This request was denied and the IEP team was unable to come to an agreement

Exhibit 3
Page 1 of 6

regarding Student's IEP for the 2005-2006 school year.

3. In addition to being home schooled, Student is currently receiving nine hours per week of a home program. The program is administered by a provider called Early Education for Children with Autism (EECA) pursuant to the Student's last agreed upon IEP, in 2004.

4. Student was last assessed by the District on April 25, 2003. The IEP team did not accept the psychological assessment that had been completed by the District. Rather, the IEP team utilized a report by Jeffrey S. Owens, Ph.D, NCSP, dated December 3, 2003.

5. During the 2003 assessment, the District attempted unsuccessfully to conduct near-vision and hearing screenings. Many near-vision and hearing tests have been attempted on Student however the medical professionals have been unable to complete a test on Student.

6. Troy Knudsvig is a program specialist for the District. He has worked for the District since November 2002. Because it was time for Student's triennial review, and because Student had been home schooled such that the District had not observed him in close to one year, Mr. Knudsvig prepared the assessment plan.

7. The assessment plan was completed on February 22, 2006. The following assessments were requested: academic and pre-academic achievement, cognitive developmental learning ability, perceptual-motor development, language/speech development, social/emotional/behavioral development, self-help/adaptive, health/development/medical, observations/interviews and review of Student's home program data books.

8. The assessment plan was received by Student's parents on March 2, 2006. Student's mother wrote a letter in response indicating that she preferred to meet and discuss the assessment plan before giving approval. Student's mother indicated that she was available on most Tuesdays, Wednesdays, Thursdays,

and Fridays after 4:00 p.m. She also requested "explicit information regarding the areas checked on the assessment plan."

9. On March 23, 2006, Mr. Knudsvig responded by letter on behalf of the District. The District provided documentation identifying the assessment tools that the District assessors planned to utilize with Student. The letter included a caveat that assessors may determine that assessment with a different tool is necessary during the course of assessing a student. Additionally, the District informed Student's mother that a meeting could not be convened after 4 p.m. because members of the assessment team are only available during the regular school hours of 8 a.m. to 3:15 p.m. Mr. Knudsvig further indicated that he would be available by telephone or letter and indicated that he would be available during the week of Spring Break.

10. On March 29, 2006, Student's mother responded by letter to Mr. Knudsvig. She indicated that she needed to know which versions, composites, and subtests the District planned to administer for certain assessments. On March 29, 2006, Mr. Knudsvig responded by letter. He indicated that the District is not obligated to identify the specific assessment tools that it will administer and that it is not possible to identify each specific test and subtest because the tests an assessor opts to administer during the course of an assessment may change based upon various circumstances that may arise during the course of the assessment.

11. On April 7, 2006, Student's mother responded by letter indicating that she had not been provided adequate information to consent to the assessments. She indicated that the IEP team is required to conduct a review of current data and observations to determine what additional data, if any, is needed to make the necessary determinations under Education Code section 56381. She further indicated that sufficient data can be obtained by assessing in the areas of academic achievement, language/speech development, and related services and would not agree to assessment in the other areas without further

Exhibit 3
Page 2 of 6

discussion and a meeting with the IEP team.

12. Student's parents signed part of the assessment plan and agreed to the academic and pre-academic achievement assessment, the perceptual-motor development assessment, the language/speech development assessment, and the self-help/adaptive physical education assessment, and the review of Student's home program data books. The assessments that Student's parents object to are the cognitive developmental learning ability assessment, the social/emotional/behavioral development assessment, the health/development/medical assessments, and the observations/interviews.

13. Student's parents contend that their relationship with the District has soured. Student's parents distrust the District. They did not consent to the February 22, 2006 assessment plan because they disagreed with the way it was written. According to Student's parents, the District did not provide sufficient information regarding the assessments to be conducted by the psychologist and the nurse for the parents to feel comfortable with the plan and feel that Student's rights were protected.

14. Student's parents object to the school's psychologist performing the assessments. Student's parents contend that the District has an agenda to make Student ineligible for special education services and that the school psychologist might alter the tests performed or adjust the results if asked to do so by personnel of the District. Student's parents are concerned because they believe that someone more familiar with their son should perform the psychological exam. Specifically, they believe that the assessment should be performed by their EECA provider. In addition to their concern regarding the psychologist, they are concerned about having another Intelligence Quotient (IQ) test administered in addition to those already in Student's records. Student's parents are frustrated because their son has been given many (IQ) tests and has received scores which vary more than 40 points. Finally, parents are concerned that the school district has filed for this due

process hearing in an attempt to bolster their offer of FAPE for the 2005-2006 school year. It is the parent's contention that the school district wishes to use the assessment results to show that they offered FAPE for the 2005-2006 school year.

15. John Kroncke is a credentialed school psychologist who works for the District. He has worked as a school psychologist for 23 years. He has assessed more than 2,000 students for school districts. Approximately fifteen to twenty of those assessments involved students with autism but he has no experience treating children with autism. Mr. Kroncke was asked to assess Student's cognitive, perceptual-motor, self-help and adaptive physical ability and his fine motor tasks. Mr. Kroncke does not know Student personally. He testified that because he uses standardized instruments, he does not need to know the students beforehand.

16. Each student's present levels change from year to year. Nonetheless, Mr. Kroncke does not intend to conduct an IQ test in this case. He does not believe that it is necessary to obtain an IQ score in a case like this. It is not proper for anyone to tell Mr. Kroncke what tests he should give in an assessment and no school district has ever told him what tests to use. The District's assessments are not based on any single test and that the District does not rely on age level equivalencies when developing an IEP. Rather, the IEP team will do a qualitative review and look at the specifics regarding each student to develop the plan. Further, Mr. Kroncke does not make placement recommendations.

17. When asked, on cross examination, if the individual who has been providing treatment for Student for three years could provide a more accurate assessment than he could, he responded that he would review the home program and garner input from the in-home provider but he doesn't believe that just because the in-home provider knows Student better, she could provide a more accurate assessment. Mr. Kroncke's testimony was credible and is entitled to great weight.

18. During the hearing the parties stipulated that,

---

Exhibit 3
Page 3 of 6

upon reasonable notice, the parents will consent to the occupational therapy assessment and the adaptive physical education assessment and the parents agree to make Student available for those assessments.

19. Michele Westgard is a speech and language therapist employed by the District. She has worked at Vail Ranch Middle School for five years. She has worked with disabled children for the past seven years. She testified that she is missing one section of her communication development assessment for Student. The Functional Communication Profile is a questionnaire that looks at different basic areas of communication. She asked that it be filled out by the EECA provider and she has not yet received it back.

20. Claire Johnson is a school nurse at the District. She has worked for the District for seven years and covers three school sites. She is part of the IEP teams and conducts health assessments. Autistic children have special health concerns. Many engage in self-injurious and other health related behaviors. She is responsible for conducting the vision and hearing tests for students and she compiles health histories of students. Student's parents are concerned that the health assessments are a waste of time because no one has ever been able to successfully conduct a near-vision or hearing test on Student. Ms. Johnson testified that if she were unable to assess a student, she would ask the parents to go through their insurance to obtain outside assessments.

## Legal Conclusions

### Applicable Law

1. A child with a disability has the right to a free appropriate public education (FAPE). (20 U.S.C. # 1412 (a)(1)(A); Ed. Code, # 56000.) A FAPE is defined in pertinent part as special education and related services that are provided at public expense and under public supervision and direction, that meet the State's educational standards, and that conform to the student's IEP. (20 U.S.C. # 1401(9); Cal. Code Regs., tit. 5, # 3001, subd. (o).) Special education is defined in pertinent part as specially designed instruction, at no cost to parents, to meet the unique

needs of a child with a disability. (20 U.S.C. # 1401(29); Ed. Code, # 56031.)

2. Before any action is taken with respect to the initial placement of an individual with exceptional needs in special education instruction, an individual assessment of the pupil's educational needs shall be conducted in all areas of the suspected disability. (20 U.S.C. # 1414(a)(1); Ed. Code, # 56320.) When developing a pupil's IEP, the IEP team must consider the results of this initial assessment, or the most recent assessment, of the pupil. (20 U.S.C. # 1414(c)(1)(A); Ed. Code, # 56341.1, subd. (a)(3)) Regarding the reassessment of a student with an IEP, Education Code # 56381, subdivision (a)[1] provides, in relevant part:

"A reassessment of the pupil, based upon procedures specified in Article 2 (commencing with section 56320) shall be conducted at least once every three years or more frequently, if conditions warrant a reassessment, or if the pupil's parent or teacher requests a reassessment and a new individualized program to be developed."

3. Both state and federal law make it clear that before conducting an assessment, the District is required to secure parental consent (20 USC # 1414(a)(1)(C)(i); Cal. Ed. Code, # 56321, subd.(c).) However, the District may proceed with an assessment by seeking a determination through a due process hearing that such assessment is necessary. (20 USC 1414(a)(1)(C)(ii); Cal. Ed. Code, # 56321, subd. (c), 56501, subd. (a)(3).)

4. The Ninth Circuit Court of Appeals has held that if parents wish their child to receive special education and related services, they must allow the responsible educational agency to assess their child. *Gregory K. v. Longview Sch. Dist.* (9th Cir. 1987) 811 F.2d 1307, 1315. There is no exception to this rule. *Andress v. Cleveland Independent Sch. Dist.* (5th Cir. 1995)64 F.3d 176, 178.

5. A school District is required to assess a student in all areas related to a suspected disability including, where appropriate, health and

Exhibit 3
Page 4 of 6

development, vision, hearing, motor abilities, language function, general intelligence, academic performance, communication, self-help skills, orientation and mobility, career and vocational interests and abilities, and social/emotional status. (20 USC # 1414(b)(3)(C); 34 CFR # 300.352(g); Cal. Ed. Code # 56320, subd. (f).)

6. The assessments proposed must themselves meet the statutory requirements set forth in Education Code section 56320 et seq. California Education Code section 56321 sets forth the requirements for a proposed assessment plan, notice to parents, and parental consent to the assessment. Cal. Educ. Code sections 56320, subdivision (g) and 56322. The tests and assessment materials must be validated for the specific purpose for which they are used, and must be selected and administered so as not to be racially, culturally, or sexually discriminatory," must be provided and administered in the Student's native language or other mode of communication unless this is clearly not feasible, and must be administered by "trained personnel in conformance with the instructions provided by the producers of such tests." Cal. Educ. Code section 56320, subdivisions (a), (b). A psychological assessment must be performed by a credentialed school psychologist. Cal. Educ. Code section 56320, subdivisions (e), (f).

**Discussion of Issue**

7. The reassessment of Student under the February 22, 2006, Assessment Plan falls squarely within the mandate of Education Code section 56381, subdivision (a). The District established at the due process hearing that conditions warranted reassessment of Student as outlined in the February 22, 2006, assessment plan. There is no dispute that the last triennial assessment of Student occurred in 2003 and that his current triennial assessment is due in 2006. Further, there is no dispute that Student has not been assessed by the District since 2003. Reassessment is necessary to determine Student's present levels of performance and enable the IEP team to prepare the appropriate goals and objectives and to make an offer of placement at the triennial

review.

8. District personnel determined that Student, who had not been attending school for over six months, needed reassessment in a variety of areas. Such areas include cognitive, functional, and behavioral abilities. This satisfies the substantive requirements of Education Code section 56381, subdivision (a)(1).

9. Moreover, District had not conducted an assessment of Student within one year before the February 22, 2006, assessment plan was created, and a triennial review was due in 2006. This satisfies the procedural requirements of Education Code section 56381, subdivision (a)(2). Not only is the District entitled to conduct an assessment, it is required to conduct an assessment and the fact that the parents refuse to sign the assessment plan does not relieve the District of that obligation.

10. The District's proposed assessors are competent, qualified, and meet the requirements of Education Code sections 56320 and 56322. There was no competent evidence presented to support the contention that Mr. Kroncke would tailor either the tests he administers or his conclusions to on the request of any person. Further, he has never been asked by anyone to do so.

11. Student's parents argue that it would be more appropriate to have someone from Student's home program, EECA, perform the assessment rather than the school psychologist. However, the law specifically mandates that a psychological assessment must be performed by a credentialed school psychologist. While Mr. Kroncke did not agree that the EECA provider would conduct a superior assessment, he did emphasize that the input provided by the in-home provider would be very important to his assessment.

12. Because the reassessments have not yet been performed, there cannot be a determination of whether the assessments will actually conform to the legal requirements. However, the District presented credible evidence that the proposed assessments are

Exhibit 3
Page 5 of 6

designed to meet the legal requirements.

13. Student's parents contend that the District is using this hearing and the triennial assessment process to support the District's contention that they offered a FAPE for the 2005-2006 school year. To support their argument, Student's parents point to the timing of the hearing. Originally the District had filed for due process to have the 2005-2006 offer deemed a FAPE. The District thereafter dismissed that due process hearing request and filed the present request. Because conditions warrant reassessment of Student, whether or not the triennial assessment has an ancillary effect on a later FAPE case is not relevant to this proceeding, and no findings or conclusions are made herein regarding the District's 2005-2006 offer of FAPE.

14. Although there was testimony that a portion of the speech and language assessment had not been completed, the portion that was not completed was to be completed by the EECA provider. The EECA provider is not a party to this action and the Office of Administrative Hearings has no jurisdiction to order the EECA provider to do anything with regard to this case.

15. All factual and legal arguments made by the parties and not addressed herein have been considered, are deemed unsupported by the evidence, determined to be without merit, and are therefore rejected.

## Order

1. The District is authorized to conduct the triennial assessment pursuant to the assessment plan dated February 22, 2006, without parental consent, within 45 days of this decision.

2. Parents shall make Student reasonably available for these assessments.

## Prevailing Party

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided. The following

findings are made in accordance with that statute:

The District has prevailed on the issue heard and decided.

[1]Under federal law, the circumstances under which a "reevaluation of each child with a disability" must be conducted are the same. See, 20 U.S.C. # 1414(a)(2)(A) for the substantive, and 20 U.S.C. # 1414(a)(2)(B) for the procedural, requirements.

**Statutes Cited**
20 USC 1412(a)(1)(A)
20 USC 1401(9)
20 USC 1401(29)
20 USC 1414(a)(1)
20 USC 1414(c)(1)(A)
20 USC 1414(a)(2)(A)
20 USC 1414(a)(2)(B)
20 USC 1414(a)(1)(C)(i)
20 USC 1414(a)(1)(C)(ii)
20 USC 1414(b)(3)(C)

**Regulations Cited**
34 CFR 300.352(g)

**Cases Cited**
558 IDELR 284
64 F.3d 176

Exhibit 3
Page 6 of 6

106 LRP 49486

### BERKELEY UNIFIED SCHOOL DISTRICT

**California State Educational Agency**

N2006050657

**June 29, 2006**

**Judge / Administrative Officer**

**Suzanne B. Brown, Administrative Law Judge**

**Full Text**

**Appearances:**

#### DECISION

Administrative Law Judge (ALJ) Suzanne Brown, Office of Administrative Hearings (OAH), Special Education Division, State of California, heard this matter on June 28, 2006, in Berkeley, California.

Petitioner Berkeley Unified School District (District) was represented by attorney Christine D. Lovely. Elaine Eger, program manager for special education, was present on the District#s behalf.

Respondent Student (Student) was represented by his aunt (Aunt). Student#s grandmother (Grandmother) was present on Student#s behalf.

The District called the following witnesses: William Bove, school psychologist; Ms. Eger; and Grandmother. Student questioned all of these witnesses, but did not call any additional witnesses.

Oral and documentary evidence were received at the hearing on June 28, 2006. The parties delivered their closing arguments during a telephone conference on June 29, 2006, at which time the record was closed and the matter was submitted.

ISSUE

May the District conduct a reassessment of Student without the consent of Student#s guardian?

-------------------------------------------------------------------

FACTUAL FINDINGS

1. Student is 16 years old and resides with Grandmother within the geographical boundaries of the District. Student#s mother has executed a power of attorney appointing Grandmother and Aunt as her agents regarding educational decisions for Student. Student attends the District#s Berkeley High School, where he has just finished his tenth grade year. He has never been determined eligible for special education.

2. Student attended second grade through sixth grade in the Oakland Unified

School District (Oakland). In or about March 2003, when Student was in sixth grade, Oakland assessed him for special education but did not find him eligible.

3. In fall 2003, Student transferred into the District and enrolled in the District#s

King Middle School (King) as an eighth grader, skipping seventh grade.1 In February and March 2004, school psychologist Don Klose assessed Student, primarily in areas related to a specific learning disability (SLD), and did not find Student eligible for special education.

4. For the 2004-2005 school year, Student attended ninth grade at the District#s

Berkeley High School. During that school year, the District agreed to Grandmother#s request for an independent educational evaluation (IEE) funded by the District. In August 2005, licensed psychologist Cheryl Jacques conducted the IEE. Dr. Jacques#s assessment report states that Grandmother #denied permission to exchange information with [the District] or any other agencies.# Dr. Jacques conducted testing of Student and interviewed Student and his family, but was not able to review his records, observe him at school, or interview his teachers. Dr. Jacques diagnosed Student with Major Depressive Episode on Axis I, pursuant to the Diagnostic and Statistical Manual-IV (DSM-IV), and recommended that the individualized education program (IEP) team find him eligible for special education as emotionally disturbed (ED). In a subsequent letter to Grandmother

Exhibit 4
Page 1 of 5

dated September 14, 2005, Dr. Jacques wrote that:

One problem has been that you have denied access to school records and thus have prevented me from having a full picture of [Student#s] struggle. As I have written to you before, the findings are based on assessment data and family input. Without the school#s input, the picture is necessarily incomplete.

5. On November 9, 2005, Dr. Jacques and District members of Student#s IEP team convened to discuss the results of Dr. Jacques#s IEE; however, none of Student#s family members appeared for the meeting. The other members of the IEP team agreed that the District should conduct its own assessment, because Dr. Jacques did not have sufficient information when she conducted the IEE. The team members agreed that District staff would mail an assessment plan to Student#s guardian.

1 Reportedly Student had been one year behind his chronological-age peers due to repeating a grade in elementary school. Apparently his skipping seventh grade occurred so that he could #catch up# with his age peers.

- 2 -

------------------------------------------------------------

6. Immediately following that IEP meeting, special education teacher Eileen

Jacobs prepared an assessment plan regarding Student. The plan indicated that the purpose of the assessment was #to determine whether your child has a disability and may be eligible for special education and/or related services.# The plan listed the areas to be assessed as: (1) academic/preacademic achievement; (2) social/adaptive behavior; and (3) intellectual development. The plan indicated that a psychologist and a special education teacher would be the professionals involved in the assessment. The assessment plan was dated November 9, 2005, and was mailed to Grandmother for her signed consent. Grandmother never returned the assessment plan.

7. On January 17, 2006, the IEP team convened

again to discuss the results of the IEE conducted by Dr. Jacques. Student#s grandmother and aunt both attended this IEP meeting. During the meeting, District staff agreed that they did not have enough information to determine whether Student was eligible for special education, and indicated that the District needed to conduct its own assessment. The IEP notes indicate the following:

The district does not feel that [Student] qualifies for Special Education services based on Cheryl Jacques assessment. The District would like to assess [Student] to determine whether or not he qualifies for Special Education services.

At the IEP meeting, District staff presented Grandmother and Aunt with a second assessment plan. This assessment plan was dated January 17, 2006, but was otherwise identical in content to the November 9, 2005 assessment plan. Both plans proposed to assess Student in academic/preacademic achievement, social/adaptive behavior, and intellectual development. Neither Grandmother nor Aunt signed consent to either assessment plan.2

8. On January 27, 2006, District staff convened a meeting with Aunt to consider Student#s eligibility under Section 504 of the Rehabilitation Act (Section 504). While at that meeting, school psychologist William Bove presented to Aunt another assessment plan, which was essentially identical to the previous two proposed assessment plans.

9. On March 21, 2006, the IEP team convened for another IEP, with Aunt in attendance. District staff again offered an assessment plan, dated March 20, 2006, but Aunt refused to take it or sign it. 3

2 A January 23, 2006 letter from Grandmother to special education program manager Elaine Eger stated that Grandmother and Aunt believed that the assessment plans were not specific enough, and expressed concern that Student #will be over assessed.# However, in her testimony Ms. Eger credibly established that she never received this letter.

Exhibit 4
Page 2 of 5

3 All four of the assessment plans proposed to assess in the exact same areas: academic achievement; social/adaptive behavior; and intellectual development. The District presented multiple assessment plans only for the purpose of giving the guardian additional opportunities to agree to the proposed assessment. On the assessment plans dated January 27, 2006 and March 20, 2006, the school psychologist forgot to check the boxes indicating which professionals would be conducting the assessments; however, there was no indication that this created any question about who would be conducting the assessments.

- 3 -

--------------------------------------------------------------------------

10. By the end of Student#s tenth grade year, he was attending Berkeley High School only part-time. For the fourth quarter of the 2005-2006 school year, Student#s report card indicated that, in his three classes, all of his grades were Fs.

11. William Bove, school psychologist at Berkeley High School, is one of the two proposed assessors. Mr. Bove has a Pupil Personnel Services Credential, and earned a Bachelor#s degree in psychology from University of California, Santa Barbara, a Master of Arts in Counseling from San Diego State University, and a Master of Science in Counseling and School Psychology from San Diego State University. Including his internship year, Mr. Bove has worked as a school psychologist for four years. Over the past two years, Mr. Bove and the other proposed assessor, special education teacher Eileen Jacobs, have conducted approximately 15 to 25 special education evaluations together. Mr. Bove was a knowledgeable, credible witness whose testimony is entitled to significant weight.

12. In his testimony, Mr. Bove established that the District#s assessment would include standardized testing and #ecological data gathering,# such as interviews, observations, and review of records. The assessment would be tailored to measure Student#s

specific areas of educational need. The assessors do not intend to repeat tests which have already been administered by Dr. Jacques, and instead intend to focus on areas which Dr. Jacques did not assess.

13. Assessment tools would be selected and administered to minimize any racial or cultural bias. Regarding assessment in intellectual development, Student has already been tested in this area, and therefore retesting may not be required. If further testing in this area is required, the assessors would not administer any standardized intelligence quotient (IQ) tests, and would instead use alternative testing for intellectual development, such as the Wide Range Assessment of Memory and Learning (WRAML).

14. Regarding assessment in academic achievement, the assessors would review Student#s school functioning, and would review results of academic achievement tests such as the current version of the Woodcock-Johnson Tests of Achievement (Woodcock-Johnson). Measuring Student#s school functioning would include interviewing his teachers, observing him at school, and reviewing his grades. Any standardized testing in academic achievement would be administered by the special education teacher, Ms. Jacobs. Because both Dr. Jacques and Mr. Klose administered achievement testing to Student, further standardized testing in this area may not be required.

15. Mr. Bove would assess Student#s social and adaptive behavior by observing Student and interviewing Student and others who know him well, such as his teachers. In particular, Mr. Bove would conduct these observations and interviews to evaluate how Student#s depression impacts his educational performance. Additional formal testing in this area may not be required, because Dr. Jacques already conducted that testing.

16. The proposed assessment plans would assess Student in all areas related to his suspected disability. In light of Dr. Jacques#s diagnosis of Major Depressive Episode and

Copyright # 2007 LRP Publications

Exhibit 4
Page 3 of 5

- 4 -

recommendation for ED eligibility, ED is an area of suspected disability for Student. The assessments will also assess Student related to two other suspected disability categories, SLD and other health impaired (OHI). Mr. Bove is knowledgeable about the areas of disability he proposes to assess, and is trained in administering the proposed tests and other assessment materials.

LEGAL CONCLUSIONS

1. School districts are required to systematically seek out all persons under the age of 22 who reside within their boundaries and have exceptional educational needs. (Ed. Code # 56300; 20 U.S.C. # 1412(a)(10).) To implement this #child find# obligation, #each district, special education local plan area, or county office shall provide for the identification and assessment of an individual's exceptional needs, and the planning of an instructional program to meet the assessed needs.# (Ed. Code # 56302.)

2. Before any action is taken with respect to the initial special education placement of a student, the student must be assessed in all areas related to his or her suspected disability. (Ed. Code # 56320, subd. (f); 34 C.F.R. # 300.532(g).) The process for assessment begins with a written referral for assessment by the parent, teacher, school personnel, or other appropriate agency or person. (Ed. Code ## 56302, 56321, subd. (a); Cal. Code Regs., tit. 5, # 3021.) Within 15 days of referral (with exceptions not applicable here), the parent or guardian must be given a written assessment plan which explains, in language easily understood by the general public, the types of assessments to be conducted. (Ed. Code # 56321, subd. (b).) The parent or guardian then has 15 days to consent in writing to the proposed assessment. (Ed. Code # 56321, subd. (c).) Generally, a local education agency must have the parent#s or guardian#s consent prior to conducting an assessment. (20 U.S.C. #

1414(a)(1)(C)(i); Ed. Code # 56321, subd. (c).) However, a local education agency can overcome a lack of consent for an evaluation by establishing at a due process hearing that an assessment is necessary. (Ed. Code ## 56321, subd. (c), 56506, subd. (e); 20 U.S.C. # 1414(a)(1)(C)(ii); 34 C.F.R. # 300.505(b).)

3. Reassessment of a pupil shall occur if the local educational agency determines that the educational or related services needs of the pupil warrant a reassessment, or if the pupil#s parents or teacher request a reassessment. (20 U.S.C. # 1414(a)(2)(A); Ed. Code # 56381, subd. (a).) To proceed with a reassessment over a parent#s objection, a school district must demonstrate at a due process hearing (1) that the parent has been provided an appropriate written reassessment plan to which the parent has not consented, and (2) that the student#s triennial reassessment is due, that conditions warrant reassessment, or that the student#s parent or teacher has requested reassessment. (Ed. Code ## 56321, 56381, subd. (a).)

4. In order for a student to be determined eligible for special education, the

Student#s IEP team must determine the following: (1) whether the student has a qualifying disability and (2) by reason thereof needs special education and related services and (3) the

- 5 -

student#s needs cannot be met in the regular classroom with modifications. (Cal. Education Code ## 56026, 56329, subd. (a); 34 C.F.R. # 300.7(a).) To meet the criteria for the qualifying disability of ED, a student must exhibit one or more of the following characteristics over a long period of time and to a marked degree, which adversely affects educational performance: (1) an inability to learn which cannot be explained by intellectual, sensory, or health factors; (2) an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; (3) inappropriate types of behavior or feelings under

Exhibit 4
Page 4 of 5

normal circumstances exhibited in several situations; (4) a general pervasive mood of unhappiness or depression; or (5) a tendency to develop physical symptoms or fears associated with personal or school problems. (Cal. Code Regs., tit. 5, # 3030, subd. (i); 34 C.F.R. # 300.7(c)(4).)

5. Parents who want their child to receive special education services must allow reassessment if conditions warrant it. In Gregory K. v. Longview School Dist. (9th Cir. 1987) 811 F.2d 1307, 1315, the court stated that #if the parents want [their child] to receive special education under the Act, they are obliged to permit such testing.# (See, e.g., Patricia P. v. Board of Educ. of Oak Park and River Forest High School Dist. No. 200 (7th Cir. 2000) 203 F.3d 462, 468.) In Andress v. Cleveland Independent. School Dist. (5th Cir. 1995) 64 F.3d 176, 178, the court concluded that #a parent who desires for her child to receive special education must allow the school district to evaluate the child ... [T]here is no exception to this rule.#

6. Contrary to the Student#s contention, there is no evidence that the proposed assessment would #over-assess# the Student.4 In order for Student to be determined eligible for special education under the category of ED, the IEP team must determine that Student exhibits one of the five characteristics of ED over a long period of time and to a marked degree, which adversely affects educational performance. The team must further determine that, due to his ED, Student needs special education and related services, and those needs cannot be met in the regular classroom with modifications. Pursuant to Factual Findings 4, 5, 15, and 16, Dr. Jacques diagnosed Student with one of the five characteristics of ED, but did not have sufficient information to evaluate whether or how that characteristic adversely affects Student#s educational performance. Hence, further assessment is required to determine whether the Student is eligible for special education, and therefore conditions now warrant reassessment of Student by the District. Moreover, as determined in Factual Findings 12-15, the District does not intend to assess

the Student in areas sufficiently covered by Dr. Jacques#s assessment.

7. Pursuant to Factual Findings 6-9 and 11-16, above, the District has presented the guardian with appropriate written assessment plans to which she has not consented, and those assessment plans propose conducting assessments which meet the legal requirements, in particular the requirements of Education Code sections 56320 and 56321.5

4 Many of Student#s other arguments were irrelevant to the hearing issue. For example, Student contended that the District failed to provide requested pupil records, and that the District never completed its 2004 assessment of Student.

5 At the hearing, the Student did not assert that the assessment plans failed to comply with any legal requirements.

- 6 -

--------------------------------------------------------------

ORDER

8. The District is entitled to assess Student in accordance with its reassessment plans dated November 9, 2005, January 17, 2006, January 27, 2006, and March 20. 2006.

9. The District shall notify Student#s guardian in writing of the date and place of the assessment at least fifteen calendar days before the reassessment occurs.

10.

Student#s guardian shall make him reasonably available for the reassessment.

Exhibit 4
Page 5 of 5